**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Williams,<br><br>        Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of Social Security,<br><br>        Defendant. | No. CV 10-2201-PHX-JAT<br><br>**ORDER** |

Pending before the Court is Plaintiff Michael Williams' appeal from the Administrative Law Judge's ("ALJ") denial of Plaintiff's application for Supplemental Social Income benefits. For the reasons that follow, the Court affirms the ALJ's decision to deny Social Security disability benefits.

**I.    PROCEDURAL HISTORY**

On March 19, 2008, Plaintiff filed an Application for Supplemental Security Income alleging a disability onset date of November 1, 1995. Record Transcript ("TR") 96. Plaintiff's claim was initially denied on June 25, 2008, and upon reconsideration it was denied on September 18, 2008. TR 12. Plaintiff timely requested a hearing, which was held on December 7, 2009. TR 12. The Social Security Administration ("SSA") denied Plaintiff's application on March 15, 2010, finding that Plaintiff was capable of performing

occupations such as car wash attendant, janitor, and housekeeper. TR 9, 18. After Plaintiff's request for review by the SSA Appeals Counsel was denied on August 19, 2010, Plaintiff commenced an action before the District Court on October 15, 2010. (Doc. 11 at 17).

## II. FACTUAL BACKGROUND

### A. Plaintiff's Disability Claim

Although Plaintiff alleges a disability onset date of November 1, 1995, it is indisputable that the relevant date of disability for this case is the date of Plaintiff's Application for Supplemental Security Income, March 19, 2008. TR 12; Doc. 11 at 2. Plaintiff asserts that he is disabled due to bipolar disorder and antisocial personality disorder, as well as back and knee problems. TR 14.

### B. Plaintiff's Background

Plaintiff was born on July 11, 1960, stands at 5 feet, 10 inches tall, and weighs 180 pounds. TR 192. He lives with his parents, and receives food stamps. TR 32-33. Plaintiff dropped out of school in the 10th grade, and subsequently received a GED in 2005. TR 27, 118. Plaintiff has not earned more than $250.00 in a year since 1989. TR 104-05. He worked with his father for a few months in 2007 building fences, but his father's business closed. TR 186. Plaintiff has been incarcerated four times: in 1983 for a period of 18 months; in 1994 for a period of 18 months; in 1998 for a period of four years; and in 2003 for a period of two years and seven months. TR 186. Plaintiff received disability benefits form 2002-2004, but the benefits were suspended, and ultimately terminated, due to his incarceration. TR 25-26. Plaintiff reports having abused drugs and alcohol in the past, but his addictions are currently in remission. TR 261. However, he does report having smoked marijuana once since March 2008. TR 46.

On December 7, 2009, Plaintiff testified before the ALJ regarding his alleged disabling conditions. TR 23-52. He testified that he was diagnosed with bipolar disorder in 2005, and that he currently takes four prescription medications, including Clonidine, Seroquel, Trazodone, and Zyprexa. TR 35, 44. Plaintiff testified that he has taken these medications since 2007, although he has stopped taking them periodically. TR 44-45. He

1 related that he occasionally stops taking his medications for several reasons, including feeling
2 as if he does not require medication, to exact revenge on people, and the voices in his head
3 tell him to stop taking medication. TR 36, 45. Plaintiff also stated that he experiences
4 frequent auditory hallucinations that make it difficult to concentrate, and that the voices in
5 his head tell him to do harmful things, such as walk into traffic. TR 35-36, 40-41.

According to Plaintiff, he has difficulty sleeping, even when he is taking medication. TR 41. He relies on his mother to cook for him. TR 42. However, Plaintiff does help around the house by doing yard work and taking out the trash. TR 42. Plaintiff testified that he takes walks to a park that is less than a mile from his parents' house. TR 43. In April 2008, Plaintiff reported that his daily routine consisted of eating breakfast, feeding and playing with the family dog, watching television, taking his medications, going to the park, going to doctor's appointments, eating dinner, watching more television, and taking his medications before going to bed. TR 122.

### C.     Record Evidence

#### 1.     Mental Impairments

Plaintiff has received behavioral health treatment since he was 15 years old. TR 305. In August 2006, Plaintiff underwent a psychiatric evaluation at New Horizons Counseling Service, Inc. ("New Horizons"). TR 338. Plaintiff sought help for depression, auditory hallucinations, and his inability to sleep well. TR 338. At that time, a treating nurse practitioner, Maryam LaTeef, diagnosed Plaintiff with bipolar disorder and polysubstance abuse. TR 342. She prescribed Zyprexa, Wellbutrin, and Clonidine to help him with his disorders. TR 342. Later that year, in November 2006, Ms. LaTeef's psychiatric progress note continued to diagnose Plaintiff with bipolar disorder, but Plaintiff denied any further polysubstance abuse. TR 347. Also in November 2006, Ms. LaTeef completed a form indicating that she believed that Plaintiff had a physical or mental incapacity, which prevented him from engaging in any substantially gainful employment, and that Plaintiff's medical impairment was expected to last no less than 12 months. TR 349. A progress note in December of 2006 stated that Plaintiff was doing well, and that his mood was stable. TR

352. However, a few months thereafter, in April 2007, Ms. LaTeef's progress note stated that Plaintiff's condition had worsened, and that he was experiencing depression and auditory hallucinations. TR 354. Plaintiff appears to have stopped going to New Horizons after missing several group counseling sessions. TR 282.

In February 2008, Plaintiff was seen by Dr. Anupama Trighatia of Terros, Inc. ("Terros"). In his initial psychiatric evaluation, Dr. Trighatia diagnosed Plaintiff with schizoaffective disorder and alcohol dependence in remission. TR 230-34. During an April 2008 appointment with Dr. Trighatia, Plaintiff reported that he continued to have auditory hallucinations. TR 228. The following month, Dr. Trighatia determined that Plaintiff was not as stressed as before, and he specifically noted that the prescribed medications were helping control Plaintiff's anxiety and auditory hallucinations. TR 224. In early July 2008, Plaintiff reported to Dr. Trighatia that he still experienced frequent, negative auditory hallucinations. TR 270. Later that month, in Plaintiff's last visit with Dr. Trighatia, Dr. Trighatia noted that Plaintiff was sleeping better, but that he still suffered from negative auditory hallucinations. TR 267.

In January 2009, Terros nurse practitioner Sharon Gala reported that Plaintiff became homeless in August of 2008. TR 357. Following an appointment with Plaintiff, she noted that Plaintiff's appearance was good, his mood relaxed, his speech normal, his thought process unremarkable and non-psychotic, and his concentration good. TR 357. However, she found that Plaintiff had stopped taking his medications and returned to illicit drug use; she diagnosed him with schizophrenia and polysubstance abuse. TR 357. Plaintiff failed to show up to scheduled appointments with Terros in March and April of 2009, and Terros eventually discontinued client services with Plaintiff due to lack of contact in May 2009. TR 365-368.

On May 15, 2008, Plaintiff underwent an hour-long psychological evaluation with Dr. David G. Jarmon, as part of a disability determination. TR 185. During the examination, Dr. Jarmon observed that Plaintiff's verbal responses were relevant and coherent, there were no indications of hallucinations or bizarre mannerisms, but Plaintiff seemed rather tense and

anxious. TR 185. Dr. Jarmon noted that Plaintiff reported auditory hallucinations and was very depressed. TR 187-88. Dr. Jarmon diagnosed Plaintiff with bipolar disorder and polysubstance dependence in sustained full remission. TR 188. His ultimate prognosis for Plaintiff was poor. TR 188.

In June 2008, two State Agency medical consultants, Dr. Aroon Suansilppongse and Dr. Martin Koretzky, each reviewed Plaintiff's record and completed separate psychiatric review technique forms. TR 204-17, 241-54. On his review form, Dr. Koretzky found the presence of three medically determinable impairments: bipolar disorder in partial remission with medication; personality disorder; and polysubstance dependence in reported remission. TR 244, 248-49. Dr. Koretzky went on to complete a mental residual functional capacity ("RFC") assessment. In the check-the-box style RFC assessment, he marked that Plaintiff was "not significantly limited" in 14 of the 20 areas listed. In the remaining six areas, Dr. Koretzky indicated that Plaintiff was "moderately limited." TR 256-57. Dr. Koretzky summarized his findings with the following: "[Plaintiff] is capable of completing simple tasks, getting along with coworkers and supervisors[,] and adapting to changes." TR 262.

In September 2008, a State Agency medical consultant, Dr. Mary Downs, reviewed the June 2008 determination made by Dr. Koretzky. TR 281. Dr. Downs found that Dr. Koretzky's assessment was supported by the record, and she affirmed his determination. TR 281.

### 2. Vocational Expert

During the December 7, 2009 hearing before the ALJ, a Vocational Expert ("VE") testified as to Plaintiff's potential for future employment. TR 48-51.

The ALJ asked the VE a hypothetical question involving a person of Plaintiff's same age, education, and work history. TR 48. The ALJ stated that the hypothetical person: is restricted to performing simple tasks; is not significantly limited in understanding or memory; has minimal limitations maintaining attention and concentration and completing a work week; has minimal limitations interacting with the public and getting along with co-workers and supervisors; and has minimal limitations adapting to changes. TR 48-49.

1 Summing up these limitations, the ALJ informed the VE that this person is capable of
2 completing simple tasks, getting along with co-workers and supervisors, and adapting to
3 changes. TR 49. In light of these limitations, the VE found that the hypothetical person was
4 capable of performing work in the national economy, including occupations such as a car
5 wash attendant, janitor, or housekeeper. TR 49-50.

6 After the ALJ was finished asking her hypothetical to the VE, Plaintiff's attorney
7 asked the VE a second hypothetical that involved different limitations. Plaintiff's attorney's
8 hypothetical involved a person that is moderately limited in all of the following areas:
9 maintaining attention and concentration; completing a normal work day or work week;
10 interacting appropriately with the public; accepting instructions and criticism from
11 supervisors; getting along with co-workers; and responding appropriately to changes in the
12 work setting. TR 50-51. When faced with these limiting factors, the VE testified that the
13 hypothetical person was not capable of performing work in the national economy. TR 51.

### III. LEGAL STANDARD

To qualify for disability benefits under the Social Security Act, a claimant must show, among other things, that the claimant is "under a disability." 42 U.S.C. § 423(a)(1)(E). The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). A person is "under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). The Social Security regulations set forth a five-step sequential process for evaluating disability claims. 20 C.F.R. § 404.1520; *see Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (describing the sequential process). A finding of "not disabled" at any step in the sequential process will end the ALJ's inquiry. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at the first four steps, but the burden

shifts to the ALJ at the final step. *Reddick*, 157 F.3d at 721. The five steps are as follows:

1. First, the ALJ determines whether the claimant is "doing substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled.

2. If the claimant is not gainfully employed, the ALJ next determines whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). The "step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). If the claimant does not have a severe impairment, the claimant is not disabled.

3. Having found a severe impairment or impairments, the ALJ next determines whether the impairment "meets or equals" one of the impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is found disabled without considering the claimant's age, education, and work experience. *Id.* § 404.1520(d). If the impairment or impairments do not meet or equal a listed impairment, before proceeding to the next step, the ALJ will make a finding regarding the claimant's "residual functional capacity based on all the relevant medical and other evidence in [the] record." *Id.* § 404.1520(e). A claimant's "residual functional capacity" is the most the claimant can do despite all his impairments, including those that are not severe, and any related symptoms. *Id.* § 404.1545(a)(1–2).

4. At step four, the ALJ determines whether, despite the impairments, the claimant can still perform "past relevant work." *Id.* § 404.1520(a)(4)(iv). To make this determination, the ALJ compares its "residual functional capacity assessment . . . with the physical and mental demands of [the claimant's] past relevant work." *Id.* § 404.1520(f). If the claimant can still perform the kind of work he previously did, then the claimant is not disabled. Otherwise, the ALJ proceeds to the final step.

5. At the final step, the ALJ determines whether the claimant "can make an adjustment to other work" that exists in the national economy. *Id.* § 404.1520(a)(4)(v). In making this determination, the ALJ considers the claimant's residual functional capacity, together with vocational factors (age, education, and work experience). *Id.* § 404.1520(g)(1). If the claimant can make an adjustment to other work, then he is not disabled. If the claimant

cannot perform other work, he will be found disabled. As previously noted, the Commissioner has the burden of proving the claimant can perform other substantial gainful work that exists in the national economy. *Reddick*, 157 F.3d at 721.

## IV. THE ALJ'S DECISION

The ALJ evaluated Plaintiff's alleged disability according to the five-step evaluation process set forth above. TR 12-19. As an initial matter, the ALJ determined that Plaintiff has not engaged in any substantial gainful activity since March 19, 2008, the application date for the disability claim.[1] TR 14. At step two, the ALJ found that Plaintiff suffered from the following severe impairments: bipolar disorder and personality disorder. TR 14. The ALJ notes that Plaintiff, in addition to his mental impairments, initially alleged disability due to back and knee problems, but that these alleged disabilities were found to be non-severe. TR 14. Although Plaintiff had been intermittently diagnosed with polysubstance abuse, the ALJ found that this impairment was not severe, because it was in reported remission.[2] TR 14. At step three of the sequential process, the ALJ determined that Plaintiff's mental impairments did not meet or equal any of the listed impairments in the Social Security regulations.[3]

Before moving on to step four, the ALJ conducted an RFC determination in light of Plaintiff's diagnosed disorders and related symptoms. TR 16. The ALJ engaged in a two-step process: first, she determined whether there was an underlying medically determinable mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms; second, after finding a medically determinable mental impairment, the ALJ determined the extent to which Plaintiff's pains and symptoms limited his functioning. TR

---

[1] Here, Plaintiff does not challenge the ALJ's finding that Plaintiff did not engage in substantial gainful activity since March 19, 2008. TR 14; Doc. 11 at 15.

[2] Here, Plaintiff does not challenge the ALJ's finding that Plaintiff suffers only from the severe impairments of bipolar disorder and personality disorder, and that Plaintiff's back and knee problems and polysubstance abuse are non-severe impairments.

[3] Here, Plaintiff does not challenge the ALJ's finding that Plaintiff does not meet or equal any of the listed impairments. TR 15; Doc. 11 at 15.

- 8 -

16.

In evaluating the evidence, the ALJ gave "great weight" to the conclusions of Dr. Koretzky and Dr. Downs that Plaintiff is not significantly limited in understanding and memory, and he has minimal limitations in sustained concentration and persistence, social interaction, and adaption. TR 16. The ALJ gave great weight to these conclusions, because they were consistent with the record and not contradicted by Plaintiff's treating physician. TR 16. Consistent with Dr. Koretzky's and Dr. Downs' opinions, the ALJ found that Plaintiff's treating physician had not recommended limitations on his activities, and that Plaintiff possessed fairly normal characteristics at one of his most recent examinations. TR 16-17.

The ALJ gave "little weight" to consultative examiner Dr. Jarmon's opinion. TR 17. Although Dr. Jarmon had opined that Plaintiff was severely mentally ill and had a poor prognosis, the ALJ believed the prognosis was inconsistent with the other findings in Dr. Jarmon's examination. TR 17. The ALJ specifically noted that Dr. Jarmon described Plaintiff as exhibiting no unusual behaviors or mannerisms; being tense and anxious; showing no direct evidence of hallucinations; and as having good memory, concentration, and judgment. TR 17. These mild findings were inconsistent with Dr. Jarmon's conclusion that the prognosis was poor. TR 17.

The ALJ determined that Plaintiff's subjective complaints about his pains and symptoms were not credible inasmuch as these complaints were inconsistent with the determination made by Dr. Koretzky. TR 17. The ALJ based this finding on the fact that Plaintiff had not consistently sought treatment for his impairments, had periodically been noncompliant with medication, and had even done a small amount of work with his father in 2007. TR 17.

Ultimately, the ALJ concluded that Plaintiff was able to perform a full range of work at all exertional levels, and that he had minimal limitations in sustained concentration and persistence, social interaction, and adaptations. TR 16. The ALJ believed Plaintiff was "capable of completing simple tasks, getting along with coworkers and supervisors, and

- 9 -

adapting to changes. In sum, he is restricted to simple work." TR 16. The ALJ used this RFC determination when she posed her hypothetical to the VE. TR 18. Based on the RFC determination made by the ALJ, the VE found that Plaintiff could perform work in such representative occupations as car wash attendant, janitor, and housekeeper. TR 18. Accordingly, the ALJ held that Plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act. TR 18.

## V. STANDARD FOR REVIEW

A district court

> may set aside a denial of disability benefits only if it is not supported by substantial evidence or if it is based on legal error. Substantial evidence means more than a mere scintilla but less than a preponderance. Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion. Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's decision must be upheld.

*Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (internal citation and quotation omitted). This standard of review exists, because "[t]he trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). Also under this standard, the Court will uphold the ALJ's findings "if supported by inferences reasonably drawn from the record." *Batson v. Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). However, the Court must consider the entire record as a whole and "may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Robbings v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).

## VI. ANALYSIS

On appeal, Plaintiff argues that the ALJ's decision was not supported by substantial evidence, and that the ALJ committed legal error reaching her decision by discrediting Plaintiff's complaints, and relying on and disregarding certain medical opinions and records.

//

### A. Plaintiff Is Not Entitled to a Presumption of Continuing Disability

As discussed above, Plaintiff received disability benefits beginning in 2002, but the benefits were terminated upon his incarceration. Plaintiff briefly argues that he in entitled to a presumption of continuing disability because of the prior disability determination. (Doc. 11 at 28 n. 14). While federal regulations provide for the reinstatement of benefits after a recipient's release from custody, *see* 20 C.F.R. § 416.1325(b), the Ninth Circuit has found that "they provide for no such reinstatement where a recipient's eligibility has been terminated after 12 consecutive months of suspension." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1172 (9th Cir. 2008) (noting that Plaintiff's benefits had been terminated due to incarceration). Accordingly, a presumption of continuing disability in Plaintiff's case is not appropriate, and the ALJ did not err in denying Plaintiff's application for benefits on this ground.

### B. The ALJ Properly Discredited Plaintiff's Subjective Complaints

Plaintiff also argues that the ALJ failed to properly consider Plaintiff's subjective complaints. (Doc. 11 at 29). If a claimant produces objective medical evidence of an underlying impairment, as Plaintiff did here, then the ALJ cannot reject the claimant's subjective complaints based solely on a lack of objective medical evidence to fully support the alleged severity of the pain. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)). If the ALJ finds the claimant's subjective pain testimony not credible, the ALJ must make findings sufficiently specific to allow the reviewing court to conclude that the ALJ rejected the testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. *Id.* at 856-57. If no affirmative evidence of malingering exists, then the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony about the severity of his symptoms. *Id.* at 857.

In this case, the ALJ gave clear and convincing reasons for not fully crediting Plaintiff's testimony. In her decision, the ALJ concluded that Plaintiff's subjective statements regarding his symptoms were not credible to the extent that they differed from the

1  ALJ's RFC determination. TR 17. In support of this conclusion, the ALJ pointed out that
2  Plaintiff failed to show up for several of his mental health counseling appointments and
3  reported periods of noncompliance with his medications. TR 17. The treatment record from
4  Terros contains a note showing that Plaintiff may have wanted to re-establish a serious
5  mental impairment for the purpose of receiving disability benefits. TR 17. The ALJ further
6  noted that although Plaintiff testified that his mental illness had prevented him from working
7  since 1998, he actually worked with his father for a short time building fences in 2007. TR
8  17. Plaintiff stopped working because his father went out of business, not because of
9  Plaintiff's mental impairments. TR 17.

Plaintiff correctly points out that the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide . . . that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996). However, Plaintiff has offered no reason—that counters the ALJ's inference that Plaintiff's impairments are not as bad as he claims—that explains why Plaintiff failed to attend scheduled mental counseling visits or failed to seek regular treatment. The Plaintiff did explain that his auditory hallucinations are sometimes the source of his noncompliance with medication, but he also testified that "sometimes I feel like I don't need them [the medications]." TR 45. Certainly the ALJ's interpretation of the facts is not the only interpretation. However, "[w]here, as here, the ALJ has made specific findings justifying a decision to disbelieve an allegation . . . , and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision." *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).

Thus, the Court rejects Plaintiff's argument that the ALJ improperly discredited his testimony. The ALJ provided clear and convincing reasons for discrediting the portions of Plaintiff's testimony that were inconsistent with the ALJ's RFC determination, and those reasons were supported by substantial evidence.

//

## C. The ALJ Properly Relied on Dr. Koretzky's Opinions

Plaintiff contends that the ALJ failed to adequately consider and explain the weight given to the opinion of State Agency medical consultant Dr. Koretzky, in violation of 20 C.F.R. § 416.927. (Doc. 11 at 20). Much of Plaintiff's brief is dedicated to attacking the validity of the RFC determination made by the ALJ. According to Plaintiff, the ALJ made a RFC determination that is inconsistent with Dr. Koretzky's findings. (Doc. 11 at 21). This, in turn, led the ALJ to pose a hypothetical to the VE at step five that did not take into account all of Plaintiff's limitations. (Doc. 11 at 21-22). The Court will address each of these arguments as they appear in Plaintiff's brief.

First, Plaintiff correctly notes that the ALJ "must consider findings and other opinions of State Agency medical and psychological consultants." 20 C.F.R. § 416.927(f)(2)(i). Furthermore, the ALJ "must explain in the decision the weight given to the opinions of a State Agency medical or psychological consultant." *Id.* § 416.927(f)(2)(ii). In spite of Plaintiff's arguments to the contrary, the ALJ considered and evaluated the findings of Dr. Koretzky in her decision. TR 17. The ALJ specifically mentioned the limitations noted by Dr. Koretzky, as well as Dr. Koretzky's opinion that Plaintiff is "capable of completing simple tasks, getting along with coworkers and supervisors, and adapting to changes." TR 17. Additionally, the ALJ expressly explained that she gave "great weight" to Dr. Koretzky's opinions because they were consistent with the record as a whole and not contradicted by Plaintiff's treating physician. TR 17. In sum, the ALJ adequately considered Dr. Koretzky's opinions and properly explained the weight given to them in her decision.

Next, Plaintiff contends that the ALJ's RFC determination was in error, because the determination was inconsistent with Dr. Koretzky's findings. The ALJ's RFC determination concluded that Plaintiff was able to perform a full range of work at all exertional levels, but that Plaintiff had minimal limitations in the areas of sustained concentration and persistence, social interaction, and adaptations. TR 16. Plaintiff was also found to be not significantly limited in memory and understanding. TR 16. The ALJ believed Plaintiff was "capable of completing simple tasks, getting along with coworkers and supervisors, and adapting to

changes. In sum, he is restricted to simple work." TR 16. Plaintiff argues that this determination was made in error and is not supported by substantial evidence, because Dr. Koretzky actually found that Plaintiff was moderately—not minimally—limited in several different functional categories. (Doc. 11 at 19-20). On his check-the-box form, Dr. Koretzky did, in fact, signal that Plaintiff was moderately limited in the following areas: maintaining attention and concentration; completing a normal work day or work week; interacting appropriately with the public; accepting instructions and criticism from supervisor; getting along with co-workers; and responding appropriately to changes in the work setting. TR 256-57.

On initial review, Plaintiff's argument appears to have merit. However, this apparent contradiction in the record is reconciled by examining Dr. Koretzky's findings more closely. The check-the-box form filled out by Dr. Koretzky asks the reviewing medical consultant to make functional assessments in four different categories: understanding and memory; sustained concentration and persistence; social interaction; and adaptation. TR 256-57. Each of these four categories contains several specific questions relating to Plaintiff's ability to perform certain tasks. The medical consultant is asked to rate Plaintiff on each individual question; in total, there are 20 different questions. TR 256-57. On 14 of the 20 questions, Dr. Koretzky found no significant limitations; with respect to the other six questions, he indicated that Plaintiff had moderate limitations. TR 256-57. In his final case analysis summary, Dr. Koretzky did not list the degree of limitation identified in each individual question, rather he made a summary of Plaintiff's limitations in each of the four previously listed categories: understanding and memory; sustained concentration and persistence; social interaction; and adaptation. TR 261-62. Based on his prior check-the-box form, Dr. Koretzky found that Plaintiff was either not significantly limited, or that he was minimally limited in each of the four categories. This determination is consistent as a summary of Dr. Koretzky's check-the-box findings. Therefore, the ALJ was justified in relying on Dr. Koretzky's summary of Plaintiff's limitations, and the ALJ's RFC determination is supported by substantial evidence.

1    Finally, Plaintiff argues that the ALJ's hypothetical posed to the VE did not include
2    all of Plaintiff's physical limitations, and, thus, the case must be remanded for further
3    consideration. Indeed, "[h]ypothetical questions posed to the vocational expert must set out
4    all the limitations and restrictions of the particular claimant." *Embrey v. Bowen*, 849 F.2d
5    418, 422 (9th Cir. 1988). If the hypothetical posed to the VE does not include all of
6    Plaintiff's limitations, then the opinion of the VE has no evidentiary value. *Id.* If the opinion
7    of the VE has no evidentiary value, then the case must be remanded for reconsideration. *Id.*
8    at 423. However, if the ALJ does not improperly reject or ignore evidence, then the ALJ is
9    justified in relying on the VE's responses to the hypothetical posed. *Valentine v. Comm'r*
10   *Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009).

Plaintiff's principally contends that the ALJ failed to consider limitations identified by Dr. Koretzky when the ALJ formulated her hypothetical to the VE. As a result, according to Plaintiff, the VE's testimony that Plaintiff can find work in the national economy has no evidentiary value, and the case should be remanded. However, this argument is inextricably linked with Plaintiff's previous argument that the ALJ erred in reaching his RFC determination. If the ALJ properly considered Dr. Koretzky's opinions in reaching the RFC determination, then the hypothetical posed to the VE is valid. Because the Court has already determined that the ALJ was justified in relying on Dr. Koretzky's opinions, the ALJ's RFC determination includes all of the limitations set forth by Dr. Koretzky. Therefore, the ALJ was justified in relying on the VE's opinion that Plaintiff is capable of performing work in the national economy, because the hypothetical posed to the VE was based on the valid RFC determination.

**D.  The ALJ Properly Gave Little Weight to Dr. Jarmon's Opinion**

Plaintiff contends that the ALJ failed to adequately consider the opinion of the consultative examiner, Dr. Jarmon. According to Plaintiff, the ALJ did not give specific and legitimate reasons for rejecting or giving "little weight" to Dr. Jarmon's findings. (Doc. 11 at 25-28).

The opinion of an examining physician, like Dr. Jarmon, is entitled to greater weight

than the opinion of a non-examining physician. *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995). The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Id.* The opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995). The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of an examining physician. *Lester*, 81 F.3d at 831.

The ALJ dedicates a paragraph in her decision discussing Dr. Jarmon's examination of Plaintiff. She specifically mentions the negative findings in Dr. Jarmon's report, including findings that Plaintiff was found severely mentally ill in the past, is still severely mentally ill, and has a poor prognosis. TR 17. The ALJ then gives specific and legitimate reasons for rejecting parts of Dr. Jarmon's report and giving it "little weight." TR 17. The ALJ notes that Plaintiff's examination was rather unremarkable. A review of the record shows that during Dr. Jarmon's examination, Plaintiff demonstrated no unusual behaviors or mannerisms besides being tense and anxious; Plaintiff exhibited no direct evidence of hallucinations or delusional thinking; and Plaintiff showed good memory, concentration, judgment, and fund of knowledge. TR 17. Dr. Jarmon also noted that Plaintiff experienced some progress with medication. TR 17. After reviewing this report, the ALJ determined that these mild findings were inconsistent with Dr. Jarmon's poor prognosis for Plaintiff, and the ALJ decided to attribute little weight to his opinions. TR 17.

The Court concludes that the reasons given by ALJ for discrediting parts of Dr. Jarmon's report are specific and legitimate, and that those reasons are also supported by substantial evidence in the record. Consequently, the Court rejects Plaintiff's argument that the ALJ should have given more weight to Dr. Jarmon's opinion.

**E. The ALJ's Failure to More Fully Consider the Opinion of the Nurse Practitioner Is Harmless Error**

Plaintiff argues that the ALJ failed to consider or evaluate the opinion of the nurse

practitioner, Ms. LaTeef, as a "medical opinion" according to the provisions of 20 C.F.R. § 416.927. In addition, Plaintiff argues that Ms. LaTeef's opinion, as the opinion of a nurse practitioner, should have been considered and evaluated by the ALJ according to SSR 06-03p, but it was not. (Doc. 11 at 24).

First, 20 C.F.R. § 416.927 outlines the manner in which an ALJ will evaluate the *medical* opinions in the record. *See e.g.*, 20 C.F.R. § 416.927(b), (d). Importantly, only "acceptable medical sources" can give medical opinions. SSR 06-03p, 2006 WL 2329939, at * 2 (Aug. 6, 2009). Nurse practitioners are medical sources that are classified as not "acceptable medical sources." *Id.* Thus, Plaintiff incorrectly asserts that the ALJ was required to consider Ms. LaTeef's opinion as provided for in 20 C.F.R. § 416.927. However, Plaintiff correctly directs the Court's attention to SSR 06-03p as setting forth the criteria for evaluating the opinions of nurse practitioners. Recognizing that medical sources, such as nurse practitioners, increasingly provide a greater percentage of medical care, the SSA ruled that "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, at * 3.

In light of this ruling, the ALJ's decision is lacking in detail. There is no mention of Ms. LaTeef in the decision, and the only reference made to Plaintiff's treatment record at New Horizons is that Plaintiff failed to show up for several mental health counseling appointments. TR 17. The decision fails to mention that Ms. LaTeef diagnosed Plaintiff with bipolar disorder and polysubstance abuse, and that she prescribed Plaintiff several medications. Undoubtedly, the ALJ should have more thoroughly evaluated Ms. LaTeef's observations about impairment severity and functional effects. Nevertheless, the Court finds that any failure to more fully consider Ms. LaTeef's opinions was harmless error.

The Ninth Circuit has set forth its standard for harmless error: "[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that

no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006). While *Stout* dealt with harmless error in the context of undiscussed lay testimony, in this case the Court deals with harmless error pertaining to the insufficiently discussed opinion of a nurse practitioner. In finding that the ALJ committed harmless error, the Court notes that the information contained in Ms. LaTeef's records—the oldest evidence presented to the ALJ—is virtually the same as Plaintiff's more recent treatment records. Ms. LaTeef's record contains Plaintiff's bipolar disorder diagnosis, polysubstance abuse diagnosis, medications prescribed, as well as the general ups and downs of his treatment. TR 282-354. These findings are almost indistinguishable from Plaintiff's later treatment with Dr. Trighatia, and his examination with Dr. Jarmon. TR 185-89, 230-34. Furthermore, the opinion of Dr. Koretzky—the opinion to which the ALJ gave "great weight"—discusses and credits findings commiserate with those made by Ms. LaTeef. TR 261-62. Thus, this Court can "confidently conclude" that even if Ms. LaTeef's opinion had been fully discussed and credited, no reasonable ALJ would have come to a different disability conclusion.

### F. The ALJ Properly Considered the Treatment Record from Terros

Plaintiff briefly argues that the ALJ inadequately considered Plaintiff's treatment record at Terros. In particular, Plaintiff argues that the ALJ did not consider or evaluate the Terros record in Exhibit B9F, including Plaintiff's GAFs of 53, reports of auditory hallucinations, and Plaintiff's medication. (Doc. 11 at 25).

Contrary to Plaintiff's contentions, the ALJ makes several references to Plaintiff's treatment record at Terros. The Terros documents span three exhibits and several pages. TR 220-38, 266-79, 356-75. The ALJ specifically mentions that Plaintiff's treating physician at Terros never recommended any limitations on his physical activities. TR 16. Additionally, the ALJ details Plaintiff's March 2009 visit to Terros, his subsequent failure to show up for appointments at Terros, and his non-compliance with medication prescribed by physicians at Terros. TR 16-17. There is nothing in the ALJ's decision that suggests she did not properly consider the treatment record from Terros; indeed, her RFC determination

1 | is consistent with those records. Thus, the Court rejects Plaintiff's argument that the ALJ
2 | failed to properly consider or evaluate the treatment record from Terros.

## VII. CONCLUSION

In conclusion, the Court finds that the ALJ's disability determination was supported by substantial evidence in the record and was free from harmful legal error. The ALJ provided sufficient support for discrediting the subjective testimony of Plaintiff and for giving little weight to Dr. Jarmon's opinion. The ALJ's findings were consistent with the medical record provided, and the RFC determination reasonably stated Plaintiff's capabilities in spite of his impairments. Finally, the hypothetical posed to the VE at step five was valid, because it included all of the limitations in the ALJ's RFC determination.

For the reasons stated above,

**IT IS HEREBY ORDERED** that the decision of the ALJ is affirmed, and the Clerk of the Court shall enter judgment accordingly. (Said judgment shall serve as the mandate in this case.)

DATED this 1st day of August, 2011.

_____
James A. Teilborg
United States District Judge